Emily T. Qiu
Amanda D. Galvan
Earthjustice
1716 W. Babcock St.
Bozeman, MT 59715
Phone: (406) 586-9699
Fax: (406) 586-9695
eqiu@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| YELLOWSTONE VALLEY AUDUBON SOCIETY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| DEB HAALAND, Secretary, U.S. Department of the Interior, in her official capacity; MARTHA WILLIAMS, Director, U.S. Fish and Wildlife Service, in her official capacity; and the U.S. FISH AND WILDLIFE SERVICE, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.  CV-24-164-BLG-TJC

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This case challenges the United States Fish and Wildlife Service's (FWS) Environmental Action Statement (EAS) and approval of a Migratory Bird Treaty Act (MBTA) depredation permit, which allows Montana Fish, Wildlife & Parks (MFWP) to kill ospreys and other migratory birds at the Miles City Fish Hatchery, without review under the National Environmental Policy Act (NEPA).

2.      MFWP operates the Miles City Fish Hatchery in Custer County, Montana, which is located at the eastern extent of breeding ospreys on the Yellowstone River. The fish hatchery produces non-native bass, non-native bluegill, and trout for sports fishing.

3.      In the summer of 2020, plaintiff Yellowstone Valley Audubon Society (YVAS) learned that MFWP had applied for and received federal migratory bird depredation permits allowing the fish hatchery to kill ospreys and other migratory birds. The MBTA prohibits the take of protected migratory bird species without a depredation permit obtained from FWS. 16 U.S.C. § 703. Beginning in 2014, MFWP sought yearly depredation permits to address claimed operational and financial losses caused when migratory birds eat largemouth bass,

bluegill, and trout at the hatchery. FWS routinely approved MFWP's applications and issued the depredation permits.

4.      Under permits issued between 2014 and 2020, MFWP has been authorized to take—and has killed—a substantial number of migratory birds, with immediate effects on local populations. From only 2018 to 2020, MFWP personnel shot 8 ospreys, 105 Canada geese, 26 great blue herons, and 16 double-crested cormorants. As a result of these takings, according to YVAS, the number of fledglings from known osprey nests within a 20-mile radius declined drastically, and no osprey fledglings were produced in 2018, 2019, and 2020.

5.      Notwithstanding these considerable impacts, MFWP continued to seek and obtain depredation permits. In each year between 2014 and 2024, FWS issued depredation permits to MFWP to kill numerous double-crested cormorants, great blue herons, and Canada geese. And, in each year between 2018 and 2024, FWS authorized MFWP to kill multiple ospreys each year.

6.      For the 2024 depredation permit—like its practice with past permits—FWS arbitrarily and capriciously determined it was not required to prepare an Environmental Impact Statement (EIS) or

Environmental Assessment (EA) as required under NEPA. Instead, the agency incorrectly claimed a categorical exclusion applied. As a result, FWS never prepared an EA, EIS, or otherwise complied with NEPA, thus violating its statutory duty to take a hard look at the significant environmental impacts of issuing depredation permits and allowing the ongoing killing of migratory birds at the Miles City Fish Hatchery.

## JURISDICTION, VENUE, AND ADMINISTRATIVE REMEDIES

7. Plaintiff Yellowstone Valley Audubon Society brings this action pursuant to NEPA, 42 U.S.C. §§ 4321–4370m, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which waives the defendants' sovereign immunity. This Court has federal-question jurisdiction over this action, 28 U.S.C. § 1331, and may issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

8. Venue is proper in the United States Federal District Court for the District of Montana pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Montana and all of the property that is the subject of the action, the Miles City Fish Hatchery, is in Montana. Venue is also

proper under 28 U.S.C. § 1391(e)(1)(C) because officers of the United
States are defendants, and Plaintiff YVAS resides in Montana.

9.    Venue is also proper in the Billings Division of this District
because Plaintiff YVAS resides in Billings and the NEPA violations
alleged in this Complaint occurred in this District. Impacts from FWS's
take authorization of migratory birds will also be felt within the
geographical boundaries of the Billings Division. *See* Mont. Code Ann.
§ 25-2-125; *see also* Local Civ. R. 1.2(c)(1), 3.2(b).

10.    YVAS, on its own behalf and on behalf of its adversely
affected members, has standing under Article III of the U.S.
Constitution because the challenged actions cause them economic,
professional, recreational, and aesthetic harm, which will be remedied
by a favorable ruling from this Court.

11.    The challenged actions are final and subject to judicial
review under the APA, 5 U.S.C. §§ 702, 704, 706.

12.    YVAS has exhausted any and all available and required
administrative remedies.

## PARTIES

13.    Plaintiff Yellowstone Valley Audubon Society, founded in

1953, is a non-profit organization built on the tradition of special interest in birds. YVAS is organized to promote enjoyment and protection of the natural environment through education, activism, and conservation of bird habitat. Among its many projects, YVAS hosts birding trips for its members and the public; gathers bird data that it shares with organizations as well as state and federal agencies; assists with injured birds; and works with federal, state, and local wildlife and habitat management agencies and groups. One of YVAS's notable programs is its Osprey Nest Monitoring Project. YVAS and its members organized and implemented an ongoing Osprey nest monitoring project in 2009 and osprey banding in 2012. YVAS members actively participated in advocacy and communication efforts with MFWP and FWS to stop the killing of migratory birds at the Miles City Fish Hatchery. YVAS members live, work, and recreate in areas that have been and will be adversely affected by migratory bird-killing at the Miles City Fish Hatchery. YVAS brings this action on its own behalf and on behalf of its adversely affected members, several of whom have

6

advocated to FWS and MFWP to stop bird-killing at the fish hatchery.

14.   The legal violations alleged in this complaint have injured the aesthetic, conservation, recreational, educational, and wildlife-preservation interests of Plaintiff and Plaintiff organization's members. These are actual, concrete injuries caused by Defendants' failure to comply with NEPA and its implementing regulations. These injuries would be redressed by the relief requested in this complaint. Plaintiff has no other adequate remedy at law.

15.   Defendant Debra Haaland is the United States Secretary of the Interior. In that capacity, Secretary Haaland has supervisory responsibility over the U.S. Fish and Wildlife Service and is also the federal official vested with responsibility for properly carrying out NEPA compliance with respect to issuing depredation permits under the MBTA. Defendant Haaland is sued in her official capacity.

16.   Defendant Martha Williams is the Director of the U.S. Fish and Wildlife Service. Defendant Williams is sued in her official capacity.

17.   Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior. FWS is responsible for issuing

depredation permits for migratory birds such as ospreys, double-crested

cormorants, great blue herons, and Canada geese.

## LEGAL BACKGROUND

## I.    THE NATIONAL ENVIRONMENTAL POLICY ACT

18.    NEPA "is the basic national charter for protection of the

environment." 40 C.F.R. § 1500.1(a). NEPA's goal is to "prevent or

eliminate damage to the environment and biosphere and stimulate the

health and welfare of" all people. 42 U.S.C. § 4321. NEPA recognizes

that "each person should enjoy a healthful environment" and ensures

that the federal government uses all practical means to "assure for all

Americans safe, healthful, productive, and esthetically and culturally

pleasing surroundings." *Id.* § 4331(b)–(c).

19.    NEPA requires agencies to proactively "integrate the NEPA

process with other planning and authorization processes at the earliest

reasonable time to ensure that agencies consider environmental effects

in their planning and decisions, to avoid delays later in the process, and

to head off potential conflicts." 40 C.F.R. § 1501.2(a). Ultimately,

NEPA's point is "not better documents but better decisions[.]" *Id.*

§ 1500.1(c).

20.    To meet these goals, NEPA requires agencies to "take a hard look at the environmental consequences of their actions." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citing *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir.2002)). To do this, federal agencies must prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." *Id.*; 42 U.S.C. § 4332(2)(C).

21.    The EIS must discuss "alternatives to the proposed agency action." 42 U.S.C. § 4332(2)(C)(iii). These alternatives are "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An EIS must "[r]igorously explore and objectively evaluate reasonable alternatives[.]" *Id.* § 1502.14(a). The "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992) (citing *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)).

22.    The EIS must address "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[.]" 42 U.S.C. § 4332(2)(C)(ii). In so doing, the agency must

evaluate "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity[.]" *Id.* § 4332(2)(C)(iv).

23.    If an agency is uncertain about the significance of an action's environmental effects, it may begin by preparing an environmental assessment to ascertain the scope and severity of impacts. *Sierra Club v. Bosworth*, 510 F.3d at 1018. While less rigorous than an EIS, an EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and it must discuss the "[p]urpose and need" of the action, "[a]lternatives" to the action, and the "[e]nvironmental effects" of the action and alternatives. 40 C.F.R. § 1501.5.

24.    In some limited circumstances, an agency need not prepare an EIS or an EA if the action falls under a categorical exclusion. *Sierra Club v. Bosworth*, 510 F.3d at 1018–19; *Reed v. Salazar*, 744 F. Supp. 2d 98, 103 (D.D.C. 2010). A "categorical exclusion" is "categories of actions that normally do not have a significant effect on the human environment, individually or in the aggregate[.]" 40 C.F.R. § 1501.4(a). If an agency concludes that a categorical exclusion applies to its

10

proposed action, the agency must "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." *Id.*

25.    For Interior Department agencies, such as FWS, extraordinary circumstances include instances in which an action may "[h]ave highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources[,]" "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks[,]" "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects[,]" and "[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. §§ 46.215(c), (d), (e), (f).

26.    "Agencies must comply with the procedural requirements of NEPA, and the decision to forego production of an EIS or EA in favor of a categorical exclusion is subject to judicial review under the arbitrary and capricious standard of review." *Reed v. Salazar*, 744 F. Supp. 2d at 104 (citations omitted).

11

## II.    MIGRATORY BIRD TREATY ACT

27.    The MBTA, codified in 1918, is one of the oldest wildlife protection laws in the nation. The statute protects listed birds by making it unlawful for anyone to "take" or "kill" a migratory bird. 16 U.S.C. § 703(a). Take is defined as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12.

28.    Depredation permits are an exception to this general prohibition against take. 50 C.F.R. § 21.100. Individuals and entities such as MFWP can seek depredation permits from FWS. The permits authorize the permittee to take specified birds to reduce damage caused by such birds or to protect human health and safety or personal property. FWS, Migratory Bird Depredation, https://www.fws.gov/ service/3-200-13-migratory-bird-depredation (last visited Nov. 7, 2024). Depredation includes "agricultural damage, private property damage, threats to human health and safety, and threats to recovery of protected wildlife." *Id.*

29.    Notably, depredation permits are short-term solutions. They are only approved for at most one year. 50 C.F.R. § 21.100(d). Moreover,

they cannot be the primary means of addressing bird depredation and must be issued in conjunction with non-lethal measures. FWS, Migratory Bird Permitting Handbook ("Handbook") 3.2; *see also* 2024 Depredation Permit, 2023 Depredation Permit, 2022 Depredation Permit, 2020 Depredation Permit, 2019 Depredation Permit, 2018 Depredation Permit. Non-lethal methods include harassment, habitat management, cultural practices, and policies. FWS, Migratory Bird Depredation, https://www.fws.gov/service/3-200-13-migratory-bird-depredation (last visited Nov. 7, 2024).

## FACTS

**I.    OSPREYS AND OTHER MIGRATORY BIRDS ALONG THE YELLOWSTONE RIVER**



FWS, https://www.fws.gov/species/osprey-pandion-haliaetus

30.    The Yellowstone River is home to migratory birds including ospreys (*Pandion haliaetus*), great blue herons (*Ardea herodias*), double-crested cormorants (*Nannopterum auritum*), and Canada geese (*Branta canadensis*). From the 1950s to the 1970s, birds like ospreys experienced devastating impacts from chemicals like dichlorodiphenyltrichloroethane, commonly known as DDT, which caused a dramatic decline in populations across the country. In some areas of the U.S., about 90% of breeding osprey pairs disappeared during this period. Since the ban of DDT in 1972, osprey populations have begun rebounding, yet they remain listed as endangered or threatened in some states.

31.    As a piscivorous bird, ospreys are unique and remarkable as the only hawk in North America that relies on an almost exclusively live-fish diet. Due to their fish-heavy diet, ospreys nest along rivers, wetlands, marshes, and lakes. In Montana, ospreys nest along the Yellowstone River during their breeding season between April and August. Generations of ospreys will add to the nest year after year, resulting in nests that can be 10–13 feet deep and 3–6 feet in diameter.

32.    Like other migratory birds, ospreys travel great distances to fulfill their life histories. In an osprey's 15- to 20-year lifetime, the bird may travel more than 160,000 migration miles.

33.    Despite the species' ongoing recovery, ospreys face pressing threats, such as conflict with humans, which result in osprey mortality and habitat destruction. With shoreline development and tree removal, natural habitat and nesting sites for the bird have decreased, and human-made nest platforms and other structures such as utility poles have become vital to the species' recovery, especially in areas where they had disappeared.

34.    The great blue heron is a distinct bird species with long legs and blue-gray plumage. As the largest North American heron, the great blue heron builds nests in colonies that can number several hundred pairs, and engages in elaborate courtship and pair-bonding displays that include a ritualized greeting and stick transfers.



FWS, https://www.fws.gov/species/great-blue-heron-ardea-herodias

35.    Because great blue herons depend on wetlands for feeding
and breeding habitat, they are susceptible to human impacts. Like
ospreys, conflicts with humans threaten mortality, including conflicts at
fish hatcheries. Humans kill herons because the species is perceived as
a threat to the survival of propagated fish. Despite great blue heron
presence at fish hatcheries, a study found that herons eat mostly
diseased fish—i.e., fish with heightened mortality risks from other
causes—because sick fish spend more time near the surface of the water
where they are more vulnerable to the herons. Cornell Lab of
Ornithology, https://www.allaboutbirds.org/guide/Great_Blue_Heron
/lifehistory (last visited Nov. 7, 2024).

36.    A waterbird, double-crested cormorants are striking with

their matte-black color, orange-yellow faces, and aquamarine eyes. They

feed by diving underwater for fish. When resting, the birds spread their

wings out to dry their feathers. For centuries, double-crested

cormorants, which have been harmed by humans and pesticides, have

experienced significant population decline.



Cornell Lab of Ornithology, https://www.allaboutbirds.org/guide/Double-crested_Cormorant/photo-gallery

37.    Recognizable by their long necks and unique coloring,

Canada geese are large waterbirds that reside near bodies of water. In

flight, the birds are often seen flying in pairs or in "V" formation flocks.

Canada geese mate for life and usually do not breed until their fourth year. Individuals tend to return to the same migratory stopover and wintering areas year after year.



FWS, https://www.fws.gov/media/canada-gooserioawb

## II.    BIRD-KILLING AT THE MILES CITY FISH HATCHERY

38.    The Miles City Fish Hatchery, operated by MFWP, primarily produces non-native bass for sport fishing. The facility is approximately 220 acres in size and includes forty-nine open ponds that range in size from half an acre to five acres.

18

39.    The hatchery is located at the eastern extent of breeding ospreys along the Yellowstone River.

40.    Since 2014, MFWP has applied for and received Federal Migratory Bird Depredation Permits allowing the facility to take migratory birds at the Miles City Fish Hatchery.

41.    MFWP claims that bird depredation has been an issue for the past decade and will likely continue.

42.    MFWP sought their depredation permits from FWS claiming that ospreys and other migratory birds were eating fish including largemouth bass—a nonnative fish species—at the fish hatchery causing an unacceptable operational and financial loss. Without undertaking NEPA review, FWS approved MFWP's applications and issued the depredation permits. From 2018 to 2020, the hatchery shot and killed 8 ospreys, 105 Canada geese, 26 great blue herons, and 16 double-crested cormorants.

43.    In 2021, the Miles City Fish Hatchery requested authorization to shoot up to 4 ospreys, 15 double-crested cormorants, 15 great blue herons, 50 Canada geese, and 5 belted kingfishers.

44.    In response to the bird-killing at the fish hatchery and growing public awareness, an informal working group of nonprofit organizations—including YVAS, state and federal agencies, industry, and universities—began meeting to discuss non-lethal alternatives to address the issue. The efforts suggested by the working group—and employed by MFWP in 2021 and 2022—included stringing lines above the ponds to discourage osprey foraging.

45.    In its depredation permit applications, MFWP stated it had used a propane cannon, cracker shells, ATVs and vehicles, inflatables, and dogs to harass the birds but that they did so with no success. Non-lethal alternatives such as fishing line or bailing twine with flagging have also been used with what appears to be limited success according to MFWP.

46.    Despite advocacy from YVAS and multiple meetings between YVAS, MFWP, and FWS to find non-lethal solutions, FWS continued to issue yearly depredation permits authorizing the killing of migratory birds at the Miles City Fish Hatchery.

47.    On April 4, 2022, FWS issued a depredation permit to the fish hatchery allowing the facility to kill 2 ospreys, 10 double-crested

cormorants, 10 great blue herons, and 40 Canada geese. On May 9, 2023, FWS issued a depredation permit to MFWP allowing the fish hatchery to kill 2 ospreys, 10 double-crested cormorants, 10 great blue herons, and 40 Canada geese.

48.    Following this pattern, FWS once again issued a depredation permit to MFWP on August 19, 2024, allowing the fish hatchery to kill 40 Canada geese, 10 double-crested cormorants, 10 great blue herons, and 2 ospreys.

## III.    IMPACTS OF BIRD-KILLING ON OSPREY

49.    As a result of the bird-killing at the Miles City Fish Hatchery, YVAS nest monitors noticed a drastic decline in breeding ospreys along the Yellowstone River around the fish hatchery. Specifically, the number of fledglings from known osprey nests within a 20-mile radius declined drastically over the last few years and no osprey fledglings were produced in 2018, 2019, and 2020.

50.    A recent study, published in 2023 confirmed the impacts observed by the osprey nest monitors: the breeding population of ospreys around the fish hatchery collapsed after 3 years of lethal control. Marco Restani, Range Contraction of an Osprey Population

Following Lethal Control at a State Fish Hatchery in Montana, 57 J. Raptor Res. 69, 72 (2023). In fact, the FWS-authorized bird-killing at the fish hatchery "became the greatest source of documented annual mortality for Ospreys along the Yellowstone River study area, exceeding electrocution mortality" and the "[s]hooting mortality appeared additive and the hatchery functioned as an ecological trap for nesting and foraging Osprey[.]" *Id*. The study area covered 950 kilometers along the Yellowstone River and included monitoring data for the annual occupancy and reproductive success of approximately 80 nests along the river.

51.    Prior to the FWS-authorized bird-killing at the fish hatchery, osprey nests along the Yellowstone River doubled and the subpopulation of ospreys around Miles City exhibited similar trends. After FWS began issuing depredation permits to MFWP and fish hatchery personnel began killing ospreys, the breeding range of ospreys contracted 48 to 67 kilometers along the Yellowstone River.

52.    YVAS continued to raise concerns of the environmental impacts caused by the depredation permits, particularly those highlighted in the Restani paper.

53.    Despite these concerns and the publication of the impacts of bird-killing on the breeding osprey population along the Yellowstone River, FWS continues to issue depredation permits to MFWP. On May 9, 2023, and again on August 19, 2024, FWS issued depredation permits, authorizing MFWP to kill 40 Canada geese, 10 great blue herons, 10 double-crested cormorants, and 2 ospreys at the fish hatchery.

54.    Even though YVAS continued to raise concerns of the environmental impacts caused by FWS's issuance of depredation permits, the agency has never undertaken a thorough analysis of the permits' environmental impacts—particularly harm to local osprey populations from their perennial killing—and alternatives to reduce those impacts, as NEPA requires. Instead, FWS begins and ends its NEPA compliance with a conclusory "Environmental Action Statement," which applies a categorical exclusion for permits that "cause no or negligible environmental disturbance." FWS failed to document any analysis of whether categorical exclusion exceptions (also known as exceptional circumstances) applied, and simply checked the boxes that they did not.

55.    Despite YVAS's collaborative efforts, FWS has continued to issue depredation permits without any NEPA analysis. The agency itself stated in its conclusory EAS that it has been issuing permits to the fish hatchery since 2014. While MFWP has implemented non-lethal measures to reduce depredation, it has repeatedly acknowledged the limited effect of these measures. Though the non-lethal methods MFWP has tried employing may have had little success, FWS has not required other viable and non-lethal alternatives. For example, in the case of aquaculture facilities, exclusion and barrier techniques like netting enclosures are highly effective. Techniques such as habitat management and changes at the source of conflict can also mitigate depredation. FWS's EAS and 2024 depredation permit do not require or meaningfully discuss employing these viable and non-lethal alternatives across the facility.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### ARBITRARY AND CAPRICIOUS APPLICATION OF A
### CATEGORICAL EXCLUSION, 42 U.S.C. § 4332(2)(C), 40 C.F.R.
### § 1501.4

56.    YVAS incorporates by reference all preceding paragraphs.

57.    Categorical exclusions only apply when an agency's action has no significant individual or cumulative environmental effect. 43 C.F.R. § 46.205; 516 DM 8.5.

58.    Before relying on a categorical exclusion, an agency must determine that exceptions to categorical exclusions, also known as extraordinary circumstances, do not exist. *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002); 43 C.F.R. § 46.205(c); *see also W. Watersheds Project v. Jewell*, 221 F. Supp. 3d 1308, 1313 (D. Utah 2016).

59.    These extraordinary circumstances include when an action may "[h]ave highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources[,]" "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects[,] "[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects[,]" and have "highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks." 43 C.F.R. §§ 46.215(c), (d), (e), (f).

60.    "Where there is substantial evidence in the record that exceptions to the categorical exclusion *may* apply, and the fact that the exceptions may apply is all that is required to prohibit use of the categorical exclusion." *Norton*, 311 F.3d at 1177. If an exception may apply, further analysis and environmental documents must be prepared, and the use of a categorical exclusion is inappropriate. 43 C.F.R. § 46.205(c)(1); *see also Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir. 1986).

61.    FWS's application of a categorical exclusion to the 2024 depredation permit was flawed from the start. When issuing the permit, the agency summarily marked in its "Categorical Exclusion Checklist for NEPA Compliance" form that no extraordinary circumstances applied despite substantial evidence demonstrating the contrary. Specifically, evidence before the agency indicated that at least four exceptions to the categorical exclusion may apply.

62.    First, FWS arbitrarily and capriciously applied the categorical exclusion for permits that "cause no or negligible environmental disturbance" because the agency's issuance of the 2024 depredation permit and related EAS has "a direct relationship to other"

issued depredation permits allowing MFWP to kill migratory birds at the Miles City Fish Hatchery. In turn, these permits have "cumulatively significant environmental effects[,]" including the elimination of the eastern range of ospreys along the Yellowstone River, and the contraction of osprey breeding range by 48 to 67 kilometers. 43 C.F.R. § 46.215(f); *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 558 (9th Cir. 2024) (NEPA requires federal agencies take a "hard look" at every stage of the NEPA process, including when applying categorical exclusions). FWS entirely failed to conduct any analysis on whether the issuance of the 2024 depredation permit may have cumulatively significant environmental effects even though the agency could reasonably foresee the effect of granting yearly depredation permits for the past decade and should have evaluated the potential impacts of the cumulative effects of these depredation permits. *See Friends of the Inyo*, 103 F.4th at 558.

63.    Second, the categorical exclusion is also inappropriate because the perennial issuance of depredation permits between 2014 and 2024, and the EAS issued with the 2024 depredation permit, "[e]stablish a precedent for future action or represent a decision in

principle about future actions with potentially significant environmental effects[.]" 43 C.F.R. § 46.215(e). FWS's practice of issuing yearly depredation permits for the past decade, and the agency's own acknowledgment in the EAS that the hatchery has obtained a depredation permit each year since 2014—even in light of significant impacts to migratory birds such as osprey—and that bird depredation at the hatchery is an ongoing problem, demonstrate this precedent.

64.    Third, the evidence before the agency demonstrates that there may be "highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources," and thus, FWS needed to consider whether this exception applied. *See* 43 C.F.R. § 46.215(c). Here, there is evidence that there is both a public and environmental controversy. *See Norton*, 311 F.3d at 1177 (both public and scientific controversies considered for exceptional circumstances). Scientific evidence of the elimination of the eastern range of ospreys along the Yellowstone River, and the contraction of osprey breeding range by 48 to 67 kilometers "at the very least [shows] there is substantial evidence in the record that exceptions to the categorical exclusion *may* apply[.]" *Norton*, 311 F.3d at 1177; *see* 43

C.F.R. § 46.215(c). YVAS's continued engagement with FWS for years regarding the bird-killing, and FWS's internal disagreement regarding issuance of the 2024 depredation permit without further review, also show "there has been continuous and significant public controversy over the environmental effects" and unresolved conflicts concerning alternative uses of available resources. *Norton*, 311 F.3d at 1177.

65.    Fourth, FWS unreasonably failed to consider the "highly uncertain and potentially significant environmental effects or [the] unique or unknown environmental risks" of issuing the 2024 depredation permit. *See* 43 C.F.R. § 46.215(d). As previously discussed, scientific documentation shows the environmental impacts of bird-killing, such as the contraction of breeding osprey range, in recent years. As such, FWS arbitrarily failed to analyze whether issuing the 2024 depredation permit involves highly uncertain and potentially significant environmental effects despite evidence of such impacts before the agency. If anything, the agency's past issuance of depredation permits, and its failure to anticipate these impacts in those prior actions, demonstrate the highly uncertain and potentially significant environmental effects.

66.    Given this "substantial evidence in the record that exceptions to the categorical exclusion *may* apply, and the fact that the exceptions may apply[,] is all that is required to prohibit use of the categorical exclusion" to issue the 2024 depredation permit. *Norton*, 311 F.3d at 1177.

67.    As such, FWS's application of a categorical exclusion without first analyzing whether extraordinary circumstances may apply was arbitrary and capricious and unlawful, in violation of NEPA, 42 U.S.C. § 4332(2)(C), NEPA's implementing regulations, and the APA, 5 U.S.C. § 706(2)(A). Consequently, FWS's EAS and 2024 depredation permit should be set aside.

## SECOND CAUSE OF ACTION
## FAILURE TO EVALUATE SIGNIFICANT AND CUMULATIVE IMPACTS, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1508.1

68.    YVAS incorporates by reference all preceding paragraphs.

69.    Under NEPA, FWS is required to "take a hard look at the environmental consequences of [its] actions." *Sierra Club*, 510 F.3d at 1018. This "hard look" must include an evaluation of all the project's direct, indirect, and cumulative environmental impacts on the physical environment, 40 C.F.R. §§ 1502.16 (environmental consequences),

1508.1(i)(3) (cumulative effects), 1508.1(i)(1) (direct effects), 1508.1(i)(2) (indirect effects). An agency must satisfy its "hard look" obligation under NEPA when considering whether exceptions to a categorical exclusion apply. *Friends of the Inyo*, 103 F.4th at 558 (NEPA requires federal agencies take a "hard look" at every stage of the NEPA process, including when applying categorical exclusions).

70.    FWS, however, failed to disclose and adequately evaluate the cumulative impacts from issuing depredation permits to the Miles City Fish Hatchery, even though YVAS raised concerns of the environmental impacts caused by the agency's perennial issuance of depredation permits. FWS did not account *at all* for the environmental impacts of the depredation permits, in an EA or EIS. Instead of preparing an EA or EIS, FWS drafted a conclusory EAS claiming a categorical exclusion applies.

71.    The one paragraph Environmental Action Statement completely ignored the impacts of the agency issuing yearly depredation permits even though it acknowledged that it has done so for the past ten years. Moreover, evidence that YVAS shared with FWS documents the significant impacts from the depredation permits on the population

31

of ospreys along the Yellowstone River. As noted before, these impacts include the elimination of the eastern range of ospreys along the Yellowstone River and the contraction of the ospreys' breeding range by 48 to 67 kilometers. Even with this evidence before it, FWS failed to conduct the necessary "hard look" into the cumulative, direct, and indirect effects of issuing the depredation permit. 40 C.F.R. §§ 1502.16 (environmental consequences), 1508.1(i)(3) (cumulative effects), 1508.1(i)(1) (direct effects), 1508.1(i)(2) (indirect effects).

72.    As a result of FWS's failure to adequately account for the impacts to osprey along the Yellowstone River, the EAS also fails to propose mitigation that will prevent or reduce these impacts. *Id.* § 1502.14(a). And the EAS entirely failed to consider alternatives to lethal control. *Id.* § 1502.14.

73.    Instead of conducting these requisite analyses—including looking at cumulative impacts, mitigation measures, and alternatives to lethal control—FWS simply concluded in its EAS that "issuing this permit is unlikely to impact the populations" of migratory birds at issue. This does not meet NEPA's mandate. *Id.* §§ 1502.16, 1502.14

74.    As a result of the failure to adequately consider the impacts,

FWS's analysis fails to rationally explain why those individual and

cumulative impacts would not be significant and fails to propose

meaningful mitigation measures to eliminate otherwise significant

impacts.

75.    FWS's EAS and its issuance of the 2024 depredation permit

pursuant to the EAS, are therefore arbitrary and capricious, in violation

of NEPA, 42 U.S.C. § 4332(2)(C), and the APA, 5 U.S.C. § 706, and their

implementing regulations, and should be set aside.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE MIGRATORY BIRD TREATY ACT, 16
### U.S.C. § 703, 50 C.F.R. § 10.12

76.    YVAS incorporates by reference all preceding paragraphs.

77.    FWS's issuance of the 2024 permit—and issuance of yearly

depredation permits from 2014 to 2024—despite evidence of significant

environmental impacts directly contravenes the MBTA's general

prohibition against the killing of migratory birds. 16 U.S.C. § 703; 50

C.F.R. § 10.12.

78.    While depredation permits can be granted, they are short-

term solutions. The permits are only approved for at most one year, 50

C.F.R. § 21.100(d), and intended to provide short-term relief and/or reinforcement of non-lethal measures while the applicant progresses towards implementing a long-term, non-lethal solution to eliminate or significantly reduce the problem. Under the MBTA, FWS must also determine that take is compatible with the preservation of the species. As noted on the depredation permits themselves and in other agency materials, lethal control cannot be conducted alone and cannot be the primary methods used to address depredation and will only be authorized in conjunction with ongoing nonlethal measures.

79.    FWS's issuance of the 2024 permit, a continuation of its yearly practice, is the primary and continuing method used to address depredation. MFWP's 2018, 2019, and 2020 applications stated that given the location of this hatchery, the depredation problem most likely will never go away. Given these statements in its applications, FWS failed to comply with its own guidance that an applicant must show progress towards implementing a long-term, non-lethal solution to eliminate or significantly reduce the problem, when it issued yearly depredation permits to MFWP, including the 2024 permit.

80.    Moreover, as the agency's own migratory bird depredation permit guidance notes, FWS must also determine that take is compatible with the preservation of the species. Given the previously discussed impacts to ospreys on the Yellowstone River, FWS acted arbitrarily in issuing the 2024 depredation permit because it has not demonstrated that elimination of the eastern range of breeding ospreys along the Yellowstone River, and the contraction of osprey breeding range by 48 to 67 kilometers is compatible with the preservation of the species.

81.    As such, FWS acted arbitrarily and capriciously in violation of the MBTA when it issued the 2024 depredation permit, and the permit should be set aside. APA, 5 U.S.C. § 706; 16 U.S.C. § 703.

## REQUEST FOR RELIEF

THEREFORE, Plaintiff YVAS respectfully requests that this Court:

A.    Declare that Federal Defendants' actions violate NEPA and the MBTA and the regulations and policies promulgated thereunder;

B.    Vacate and set aside Federal Defendants' Environmental Action Statement;

C.      Vacate and set aside the 2024 Depredation Permit;

D.      Enjoin Federal Defendants from re-issuing or approving a

depredation permit for the Miles City Fish Hatchery until Federal

Defendants have demonstrated compliance with NEPA and the MBTA;

E.      Award Plaintiff its fees, costs, and other expenses, including

attorney fees, associated with this litigation; and

F.      Grant Plaintiff such further and additional relief as the

Court may deem just and proper.

Respectfully submitted this 14th day of November, 2024.

/s/ Emily T. Qiu
Emily T. Qiu
Amanda D. Galvan
Earthjustice
1716 W. Babcock St.
Bozeman, MT 59715
Phone: (406) 586-9699
Fax: (406) 586-9695
eqiu@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiff Yellowstone
Valley Audubon Society*